UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF FLORIDA

CASE NO. 07-80021-CR-GAYLES

UNITED STATES OF AMERICA,

vs.

KERRI KALEY.

_____/

**KERRI KALEY'S SENTENCING MEMORANDUM**

Kerri Kaley respectfully submits this Sentencing Memorandum, which describes for the Court the substantial factors that support a significant downward variance. As one friend who knows her as a "friend, confidante, exercise buddy, cheerleader, neighbor, and soul sister," explains it:

> I just want you to know as you pass sentence on [Kerri] that she is worthy of your compassion and leniency. I ask you to consider her unconditional love of her husband, sons and family, her contributions to her community, her passion for her cardiac scanning business and public health, and the caring and joy she gives to her friends . . . She is entrepreneurial, stronger than most, bright and witty and one of the most genuine people I know. Her family needs her, her friends need her and, whatever penance she must serve, I believe, would be best served in her community. Thank you for your kind consideration. *Letter from Irene McCarty.*

As explained below, there are a number of factors supporting a downward variance. These include:

- the significant disparity between Kerri's guideline range and the sentences given to her co-conspirators, other similarly-situated defendants, and fraud defendants nationwide;

- Kerri's exemplary personal history and characteristics, including her charitable and community involvement, her family involvement, and her hard work and significant contributions to society during the pendency of this case;

1

- the nature and circumstances of the crime, including that her actions were, as the Government has acknowledged, consistent with "industry practice" at the time;

- the fact that her guideline range overstates the seriousness of Kerri's crime, that she has experienced significant hardship, and that a lengthy sentence is not necessary to promote respect for the law or just punishment; and

- Kerri's extreme unlikeliness to recidivate.

## ADDITIONAL SUPPORTING RESOURCES

In a separate bound volume, we provide the Court with 148 letters of support written by Kerri's friends, family, and professional acquaintances which attest that she is a truly incredible person known for her "integrity, loyalty, hard work and community outreach." *See Compendium of Letters in Support of Kerri Kaley (Letter from Donna Bright).* Every one of these letters respectfully asks the Court for leniency in Kerri's sentence. In the second portion of this volume, we include 18 letters Kerri received over the years from clients of her cardiac screen company, lauding the professionalism, generosity, and huge contribution of Kerri's efforts.



## ARGUMENT

Based on all the applicable factors, Kerri Kaley's guideline range is far in excess of a suitable sentence, and she merits a downward variance to not more than 24 months. This sentence would be more than sufficient to satisfy the factors outlined in 18 U.S.C. § 3553(a). *See Kimbrough v. United States*, 552 U.S. 85, 101 (2007).

Pursuant to § 3553(a), this Court is to consider a number of factors to arrive at a sentence that is sufficient, *but not greater than necessary*, to achieve the goals of sentencing: 1) the nature and circumstances of the offense and the history and characteristics of the defendant; 2) the need for the sentence to reflect the goals of sentencing, including the seriousness of the offense, deterrence, and protection to the public; 3) the kinds of sentences available; 4) the range determined by application of the Sentencing Guidelines; 5) any pertinent policy of the Sentencing Commission; 6) the need to avoid unwarranted sentence disparities; and 7) the need to provide restitution to victims. As the Supreme Court has explained, a district court should consider these factors to determine whether a requested sentence is appropriate, and "it may not presume that the Guidelines range is reasonable." *Gall v. United States*, 552 U.S. 38, 49-50 (2007).

Other than the acts on which these charges were based, Kerri has led an extremely admirable, law-abiding, and productive life, both before the charged acts and in the 10 years since. Given that Kerri is an extremely good person who is devoted to her community and family, and who is highly unlikely to recidivate, Kerri should not receive a sentence greater than 24 months, which is more than the collective sentence of her multiple co-conspirators. As her husband eloquently puts it,

So as you preside over the outcome of her future, please take into consideration her accomplishments, her charitable contributions as a volunteer in the community and her unwavering belief that what she does for a living makes a difference. These are actions and disciplines that exemplify what is good in today's society – work hard, compassion, respect and the ability and drive to pass them on. To date she has paid a tremendous financial and mental price to maintain her name, her dignity and her place in our family as a wife and mother. And it should be clear that she poses absolutely no threat to anyone and that she is so much more valuable as an active member of our family and community. *Letter from Brian P. Kaley.*

In sum, all of Kerri's personal characteristics and the circumstances of this case support a significant downward variance. "If given leniency, I can tell you beyond a shadow of a doubt that Kerri will be someone you look back at and say . . . I gave her a chance and I'm glad I did." *Letter from Joseph Mauro.*

We address each of the pertinent § 3553(a) factors below.

**1.   A guideline sentence would constitute a significant sentencing disparity relative to Kerri's co-conspirators. § 3553(a)(6).**

If Kerri were to receive even the low end of the guidelines, this would create a substantial sentencing disparity relative to Kerri's 5 co-conspirators, relative to other defendants recently sentenced in similar cases, and relative to the nationwide average sentence for similar cases. This is an important factor in support of a downward variance. 18 U.S.C. § 3553(a)(6).

The following table illustrates the gross incongruity between Kerri's guideline range and the sentences received by her co-conspirators:

|  | SENTENCED | SERVED |
|---|---|---|
| Jennifer Gruenstrass | 0 months (acquitted) | 0 months |
| Roni Keskinyan | 0 months (never charged) | 0 months |
| Frank Tarsia | 5 months | 0 months to date |
| Alan Schmidt | 6 months | 6 months |
| John Keith Danks | 10 months | 10 months |
| **TOTAL** | **21 months** | **16 months** |

Assuming the Court does not grant any of Kerri's PSI objections, a low-end sentence of 121 months would be almost *6 times* what her co-conspirators collectively received, and *12 times* the amount a more culpable co-defendant received. While these defendants pled guilty and received the benefits of acceptance (other than Roni Keskinyan, who the Government never even charged, and Jennifer Gruenstrass, who was acquitted at trial), there must be a reasonable limit on the trial penalty Kerri suffers for having exercised her constitutional right to proclaim her innocence in a public trial.

**If Kerri were to receive a 24 month sentence, as she is requesting, this would be _more than the total sentence of all her co-defendants combined._ This still would constitute a significant sentencing disparity, but not nearly as extreme as what the Government seeks.**

The same analysis holds true when comparing Kerri's guideline range with the sentences given to the defendants in the similar J&J medical device cases that have

been resolved.  Of the 11 such defendants we have identified, the term of incarceration varied from 0 months to a maximum of 12 months, with an average sentence of just 5.9 months.[1]  Thus, a 24 month sentence would be 4 times the average and double the highest.  A low end guideline sentence would be **20** times the average and ***6 times the highest sentence***.  Such a disparity would be unacceptable.

A sentence of 24 months is also more than adequate because it is the average sentence of theft and fraud defendants nationwide.[2]  Given the lack of a clear victim and the fact that Kerri's acts were, in the Government's own words, "industry practice" at the time (D.E. 105 at 2:14), Kerri should not receive a sentence greater than the average §2B1.1 defendant, or the many defendants who have received sentences far lighter than what the Government is seeking for far more significant conduct.  Just last month, judges ordered significant variances in far more extreme cases.  *See, e.g., United States v. Casperson*, 1:16-CR-00414 (S.D.N.Y. November 2016) (downward variance to four years from 12.5-15 year guideline range in "egregious" $95 million securities fraud Ponzi scheme); *United States v. Williams*, Case No. 1:14-CR-00784 (S.D.N.Y. November 2016) (downward variance to five years from 235-293 month

---

[1] This analysis includes the sentences given to Richard Cox, Alfredo Falcon, Jennie Glen, Troy Guzman, Barbara Lash, Frances Orlando, Martin Pellinat, Adrian Sands, Matthew Smith, Gary Strauss, and James Vogt.  It excludes the sentence of 22 months given to Anthony Jerdine who had multiple priors (and still received a sentence multiple times lower than what the Government is asking this Court to impose on Kerri).

[2] *See* http://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/ Theft_Property_Destruction_Fraud_FY15.pdf.

guideline range in $ 4 million fraud scheme in which debtors were threatened with fake arrest warrants); *United States v. Warner*, 792 F.3d 847 (7th Cir. 2015) (downward variance to probation). And, of course, the Eleventh Circuit has a long history of affirming significant variances in cases involving much more extreme conduct. *See, e.g., United States v. Neufeld*, 223 Fed. Appx. 887 (11th Cir. 2007) (48 month sentence for drug conspiracy defendant with a guideline range of 135 to 168 months).

2.   **Kerri's history and characteristics, and the nature and circumstances of the offense, demonstrate that she merits a below-Guidelines sentence. § 3553(a)(1).**

Kerri Kaley's personal characteristics and the nature and circumstances of the offense strongly support a downward variance, as she is "so much more than the person that was standing in your courtroom." *Letter from Regina Braccia (Government witness at trial).* Congress has directed that a defendant's personal characteristics should be considered ***equally*** with "the nature and circumstances of the offense." 18 U.S.C. § 3553(a)(1). Yet these factors are given no weight in the Guidelines calculation; to the contrary, the Guidelines recognize only the defendant's criminal record (providing for higher offense levels for a greater criminal history, rather than reductions for no prior record). *See Rita v. United States*, 551 U.S. 338, 364-65 (2007) ("The Commission has not developed any standards or recommendations that affect sentencing ranges for many individual characteristics. Matters such as age, education, mental or emotional condition, medical condition (including drug or alcohol addiction), employment history, lack of guidance as a youth, family ties, or military, civil, charitable, or public service

7

are. . . matters that § 3553(a) authorizes the sentencing judge to consider."). *See also United States v. Prosperi,* 686 F.3d 32, 39 & 45 (1st Cir. 2012) (affirming downward variance from 87-108 months to home detention because the loss numbers did not take into account the personal characteristics of the defendant); *United States v. Martin*, 520 F.3d 87, 93 (1st Cir. 2008) (affirming a 91-month variance down from the guideline range based in part on "the support that the defendant stood to receive from his family [and] personal qualities indicating his potential for rehabilitation").

As the letters provided to the Court more than amply demonstrate, Kerri is "the antithesis of someone I would ever expect to find in this situation." *Letter from Michelle Gatto.* These letters provide strong support for a downward variance based on Kerri's personal characteristics. *See United States v. Tomko*, 562 F.3d 558, 560 (3d Cir. 2009). In *Tomko,* the Third Circuit affirmed and concluded that the district court's reasons for a downward variance to a non-incarcerative sentence were "logical and consistent with the factors set forth in section 3553(a)." *Id.* The court wrote: "Several dozen letters written on Tomko's behalf prior to his sentencing also demonstrated Tomko's community ties and extensive charitable works. These letters indicate that Tomko performed pre-indictment charitable acts that involved not only money, but also his personal time." *Id. See also Warner*, 792 F.3d at 850 (sentencing tax fraud defendant to probation, based in part on the defendant's "overwhelming" record of "charity and benevolence," which the court noted were "motivated by the purest intentions."

Like in *Tomko* and *Warner*, the letters submitted in support of Kerri demonstrate her many laudable characteristics and support a downward variance. These letters explain, over and over, and in many different ways, that "how they raised their children, their commitment to their faith, and the charity they have always been behind in our community is nothing short of spectacular." *Letter from The Ottimo Family*. These letters describe Kerri in the most glowing of terms: "amazing person," "the gold standard," "good person with a wonderful heart," "incredible work ethic," "amazing reputation," "shining example of the all American mother," "excellent character," "always willing to lend a hand," "positive role model," "conscientious and trustworthy," "very kind and compassionate," "a shining light for those around her," "held in high esteem," "integrity," "strong and dedicated," "model citizen," "goal oriented," "absolute asset to society," "honest and sincere," "consummate ethical professional," "does the right thing even when it's hard," "extremely caring individual," "pillar of the community": in sum, "a truly amazing woman."

The following sections describe Kerri's personal background and the nature and circumstances of the crime in more detail.

## A.      Kerri's Exemplary History and Characteristics

### I.      Kerri's Charitable and Community Involvement

Kerri's extensive community involvement has been one of the most dominant parts of her life.  "It'd be great if the court could know of the invisible hours that Kerri Kaley has spent doing the right things simply because they were right." *Letter from Donna Civitello*.  Letter after letter attests that "Mrs. Kaley does and goes above and

beyond in her endeavors to make sure our community is the best it can be.  She is a very nice, law abiding person who has been a valuable, active member of our community." *Letter from Lindsay Herling*.  From the time she was a child until the present moment, Kerri has been incredibly involved in her community, constantly giving back in ways big and small.

This community involvement should be given great weight in deciding Kerri's punishment.  As one court explained, "if ever a [person] is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance. This elementary principle of weighing the good with the bad, which is basic to all the great religions, moral philosophies, and systems of justice, was plainly part of what Congress had in mind when it directed courts to consider, as a necessary sentencing factor, 'the history and characteristics of the defendant.'" *United States v. Adelson*, 441 F. Supp. 2d 506, 514  (S.D.N.Y. 2006), *aff'd* 301 Fed. Appx 93 (2d Cir. 2008).

Here is just a small sample of the many ways Kerri "has always put others before herself" and demonstrated that she is "truly an exemplary member of our community"[3]:

· "The Kaley's are fundamentally strong contributors to our community.  With three children, they are involved in countless school and community activities. *They are immensely unselfish and have a genuine concern and interest for everyone they come in contact with.*  It would be an immense loss for the Kaley's

---

[3] *Letters from Thomas Simonetti and Carol Kessler*

children and our community if Kerri were to go to jail." *Letter from Christopher Bentley* (emphasis added).

- *"Kerri never can do enough for others. Time and time again she was there to volunteer her support for my officers and their families.* Kerri has also been active in supporting causes that help families of police officers killed in the line of duty and other charitable causes that benefit police officers and their families in times of need." *Letter from James Carver* (emphasis added).

- "Kerri . . . donated her time to the Joseph P. Dwyer Peer to Peer Program which . . . helps returning Veterans that come Home and are suffering from P.T.S.D. Additionally she donated Fit Bits and backpacks to . . . a local program through the Police Officers . . . that donates to needy families within the local community, usually suffering from some medical issues." *Letter from Stephani Dwyer.*

- "Kerri contributes to many charitable causes including walk/run events for breast cancer, leukemia, and lymphoma societies, and tunnel to tower 9/11 memorials." *Letter from Patricia D. Cherasard.*

- "Kerri was someone you can count on to help at school activities as well as sporting events whenever needed. She welcomed my son into her home for playdates as well as many other children from the neighborhood. I always felt my son was and still is in good hands when at their house. . . . Kerri is not only an asset to our immediate community, she touches the lives of so many people near and far." *Letter from Janet Kalten.*

- "She serves as volunteer Secretary for the Health and Wellness Committee of the Fireman's Association of the State of New York." *Letter from Rita & Jim Tully.*

- "On many occasions she and her boys volunteered to feed the homeless in New York City." *Letter from Christine Martella.*

- "Kerri belongs to a women's group that I run and offers her advice to other members and even gave a free cardiac scan session for the members and their families. . . . Kerri Kaley is truly an integral part of our community; she is an excellent parent, a hard working business owner and a caring neighbor." *Letter from Mary Simmons.*

- "Kerri worked with me as a volunteer for our sons' team, planning events so the team could travel to compete with more distant teams. She was organized, responsible, engaging, kind, understanding, and supportive to all involved."

11

*Letter from Karen Wallace Walter.*

- "Kerri and her husband, Brian, have always been there for my family and me. She has been willing to lend a helping hand at many community events. I can always count on the Kaley family whether being at a sporting event of a school function. *Kerri is the type of woman who would help anyone needing assistance.*" *Letter from Ralph Mormile* (emphasis added).

- "The Kaley's have been active in, and exemplary members of, our community for many years. Kerri has donated significant amounts of her time, energy and resources to numerous organizations, many involving children and students, to raise awareness of conditions that affect personal health. . . . We truly believe that Kerri is a wonderful person and deserves a second chance." *Letter from Mary & Vincent Striano.*

Kerri's substantial community involvement merits a substantial downward variance. *See United States v. Thurston*, 544 F.3d 22 (1st Cir. 2008) (affirming district court's sentence of 3 months rather than 60 month guideline term for Medicare fraud conspiracy of more than $5 million, citing, among other things, defendant's charitable work, community service, generosity with his time, and the spiritual support and assistance he provided others); *United States v. D'Amico*, 496 F.3d 95 (1st Cir. 2007) (defendant's charitable efforts and contributions to the community warranted a downward variance); *United States v. Cooper*, 394 F.3d 172 (3d Cir. 2005) (affirming 4-level departure to probation in securities fraud and tax evasion case based on defendant's good works where guidelines called for 14-21 months; defendant did not simply donate money to charity but made "hands on personal sacrifices which have a dramatic and positive impact on the lives of others."); *United States v. Serafini*, 233 F.3d 758 (3d Cir. 2000); *United States v. Woods*, 159 F.3d 1132 (8th Cir. 1998).

### ii.     Kerri's critical family role.

Perhaps the most dominant theme in the dozens of letters submitted on Kerri's behalf is that she is "an exemplary wife and mother of an outstanding family." *Letter from James D. Cassidy.   See also Letter from Kelly DeGennaro* ("You could not find more loving and dedicated parents than Kerri and Brian.").

The point of these letters is not merely that Kerri has a great family who will be beyond devastated to lose her.  It is that Kerri's contributions have made those in her family *and many other families* much better people, making a substantial difference in their community and contributing substantially to our society as a whole. Here are just a few of the quotes from community and family members who emphasize this important point:

- "When I am asked to look back on my high school experience and talk about people who inspired you or influenced you, I think of one person, Alex Kaley [Kerri's son].  Alex is 'Mr. Cold Spring Harbor.'  He represented our school and community with much success through academics, athletics, and service. . . . Mrs. Kaley is an extremely positive presence in our community.  She is always there to give you a hug or a quick hello that brightens your day. . . . Once I grew to know Mrs. Kaley, I realized where Alex gets his heart and drive from. . . . *She pushes herself and those around her to do their best.*  In addition, she is a leader, who reinforces the need to work hard in everything you do."  *Letter from Caroline Kiernan* (emphasis added).

- "I would be hard pressed to come up with a time when Mrs. Kaley didn't give one hundred percent.  *When she gives it her all, you give it your all.*  She is an amazing, smart, strong, caring, productive person.  She supports innumerous causes. . . . Her dedication has bettered many lives and most of all my life.  *Her being present in my life, hands down, has bettered me." Letter from Josh Brown* (emphasis added).

- "Kerri has not only been a sister, but a mentor in life. . . . That same interest in making others better has impacted everyone she has come in contact with." *Letter from David W. Winans III.*

13

- "I know Kerri could better serve our communities not by going to jail, but by working in communities that could benefit from her strong work ethic, strength, compassion, generosity, advice and pure determination. *She has the ability to install in others, especially our youth, these great attributes.* Kerri has an amazing way of building self-confidence and positive self-esteem in the people around her." *Letter from Dawn Winkoff* (emphasis added).

- "Everyday when I wake up, I am always filled with confidence and trust that I have the tenacity to achieve what ever it is I strive for and I owe this mind set to my mom. Since I could remember, my mother would always tell me the words 'Never give up, Never surrender,' and I carry those with me everyday of my life. I also try to pass my mind set on to those around me because I feel truly blessed that I was given the mother I have." *Letter from Alexander Kaley.*

Kerri's incredible achievements as a mother and wife are especially impressive given that she was raised in a difficult home situation. As her sister explains, "We did not have the best life growing up. There was a lot of turmoil in our home, from physical abuse to psychological abuse that we suffered at the hands of my Mother's husband." *Letter from Stephani Dwyer.* Kerri's stepfather was physically and mentally abusive and as a result her home life was extremely challenging. Kerri worked hard throughout high school and college to pay for her education.

Despite the challenges of Kerri's childhood, she has raised three wonderful boys who are assets to the community. Literally dozens of letters describe Kerri's parenting, and the excellence of her sons, in the most glowing terms:

- "She has raised three of the most respectful, kind, upstanding, hard working, and committed sons who are well liked and well respected in the town, in the school, by their peers, by their teachers, and on the sports team on which they have taken part." *Letter from Karen Wallace Walter.*

- "Mrs. Kaley has deep roots in our community and her three sons are highly regarded in our school by the students, teachers and administration. Having her sons as peers of mine, I know they are always doing the right thing and on

14

task. I have always looked at them for their good morals, which were undoubtedly taught by their mom. *I could not name a better group of kids than the Kaley boys.*" *Letter from Lindsay Herling* (emphasis added)

- Kerri's sons "are exemplary young men who show respect and kindness to all they encounter. Her middle son Alex . . . was a role model for my son, Christopher. Liam is in the same grade as my son and shows tremendous character as well. Kerri's parenting ability and role in her family is clearly evident." *Letter from Ralph Mormile.*

- "She has three beautiful sons whose accomplishments any parent would be proud of. All 3 of her boys are active volunteers in the community, play sports and get good grades. *They are a tight knit family who give back together.* You don't raise 3 upstanding citizens without being a strong model, mother and upstanding citizen yourself." *Letter from Deborah Iobbi* (emphasis added).

- "We have viewed this family for several years as a special group that has great family values, humility, character and principle! On many occasions our youngest son has commented on 'what a great family they are.' That means a lot to us regarding who our children choose as friends." *Letter from Mr. & Mrs. Louis Guarneri.*

- "She has raised honest and trustworthy children who are an asset to our society. Children can only possess those values when their parents possess them as well. This family is a fine example of integrity, honesty, exemplary character and the very values we want in our society today." *Letter from Mr. & Mrs. Ronald D'Agostino.*

- "Kerri is an outstanding parent. The way her sons treat the other children at school and the kindness they have shown my son are a tribute to her parenting." *Letter from Gina Mormile.*

Kerri's incarceration will be simply devastating to her family. Her boys rely on her tremendously and she is an integral part of their lives. Kerri's son, Liam, is still in high school, and the loss of his mother will have an especially negative impact on him. As he explains it, "I still cannot fathom the idea of her going away. . . . I have tried to picture my life without her. I have found it unreassuringly hard to do so. My mother is too important to my life and well-being." *Letter from Liam Kaley,*

15

Explains Brandon, "I suffer from multiple obsessive and strong anxiety disorders that plagued several portions of my childhood.  The only steadiness I could hold on to throughout these long periods of severe doubt was my mother. . . . I sit here writing this letter of the utmost importance having taken off from my senior year of college. I felt it my duty to do so because I needed to be home for my mother, father, brothers, grandparents and other relatives during this time of shock and disbelief." *Letter from Brandon Kaley.*



A defendant's family responsibilities provide a recognized and reasonable ground for a variance. *See Prosperi,* 686 F.3d at 48 (affirming large variance where district court "recognize[d] that [the defendants] both play important roles as care givers and caretakers in their families."); *United States v. Munoz-Nava*, 524 F.3d 1137 (10th Cir.

2008) (sentence of 1 year and 1 day for a man who possessed with intent to distribute 100 grams of heroin, despite a guideline range of 46-57 months, based on his long work career, community support, lack of a criminal record, and responsibilities as sole supporter of 8-year-old son and elderly parents, which reduced the likelihood he would re-offend); *United States v. Taylor*, 280 Fed. Appx. 397 (5th Cir. 2008) (60 month prison term for trading child porn was not plain error, despite a guideline sentence of 120 months, based on defendant's lack of a prior record, his youth and impressive employment history, supportive testimony of his wife, mother, and step-father, and the needs of his newborn son); *United States v. Dominguez*, 296 F.3d 192 (3d Cir. 2002) (district court erred in concluding it could not depart four levels in bank fraud case for defendant who resided with elderly parents, who were physically and financially dependent on her); *United States. v. Prisel*, 316 Fed. Appx. 377 (6th Cir. 2008) (sentence of one day in prison plus three years supervised release for possessing child porn upheld despite guideline range of 27-33 months, where defendant worked from home, and had a dependent wife with whom he had a mortgage for which they jointly owed over $70,000); *United States v. Davis*, 2008 WL 2329290 (S.D.N.Y. June 5, 2008) (court imposed time-served on a first time offender devoted to the education of the six children of his 15 year marriage – and the judge believed incarceration would deny the children the "care and guidance clearly needed at this point in their lives"); *United States v. Crawford*, 2007 WL 2436746 (E.D. Wis. Aug. 22, 2007) (court granted a variance from the Guidelines due in part to the defendant's family situation with five children and the impact incarceration would have on the children).

Kerri is the primary financial provider for the family and also plays a critical role with regard to the children. "Without Kerri the Kaley family would be a well-oiled machine missing a crucial part to their success." *Letter from Edward James Fox IV.* Describes one friend, it would "break my heart to see her away from her family as I know they all share a single heart." *Letter from Victoria Miritello.*

### iii. Kerri's hard work and contributions during the pendency of this case.

Despite the incredible strain of a federal indictment, Kerri has conducted her life (both personally and professionally) during the pendency of this case in a highly admirable way:

> What I can attest to is that despite facing a crushng amount of financial and emotional stress and hardship for such a long period of time, both Kerri and Brian have continued to work hard, keep their home a solid and loving safe harbor, uphold themselves with humility and grace, and they have raised three fine, strong, excellent young men. To be able to do this while enduring such stresses is unfathomable. They have persevered despite such difficulties, and have always carried themselves with class and respectability. *Letter from Karen Wallace Walter.*

Kerri's excellent behavior since the time of her arrest provides strong support for a downward variance. *See Gall*, 552 U.S. at 57-58; *Pepper v. United States*, 562 U.S. 476, 491 (2011). As the Supreme Court stated in *Pepper*, evidence of rehabilitation and good post-arrest conduct is "clearly relevant to the selection of an appropriate sentence" and "provides the most up-to-date picture" of the defendant's history and characteristics. *Pepper*, 562 U.S. at 491-92. In this case, Kerri's exemplary conduct since the time of her arrest "may be taken as the most accurate indicator of h[er] present purposes and tendencies and significantly to suggest the period of

18

restraint and the kind of discipline that ought to be imposed upon h[er]." *Id.* at 492 (internal quotation omitted).

First, Kerri has not let the pressures of this case keep her from giving her all to her community. "In retrospect, the most impressive quality Kerri has shown is her resolve. . . . For eleven years, she has been dealing with this, while maintaining her integrity and character while still managing to raise three great children and run a successful business while giving back to the community. This has not been an easy path for her but she has kept a positive attitude." *Letter from Samuel T. Brown.* Dozens of letters, some of which are quoted above in the section describing Kerri, attest to her incredible community contributions during the time this case has been pending.

Second, Kerri has been a pillar of strength for her family. As one of her sons eloquently explains,

> For more than half of my life I have been exposed to the grueling and demanding nature of this federal case against my mother. Being that this exposure has transpired throughout my teenage and early adult life, I think I've been able to fully grasp the magnitude of the entire situation. I preface with this because I want, in fact even need, to convey to you that in the face of this hardship, my mom's strong presence in my life has been imperative to my well-being. . . . The potency of the positivity she has given me in my life is something I cherish deeply. *Letter from Brandon Kaley.*

Finally, throughout this period Kerri has continued to build on her long history of hard work, launching a business that has helped innumerable people. Throughout her life, Kerri has been self-made, building up successful businesses and helping countless others in the process. These efforts have continued in the last 10 years despite the incredible strain and difficulty Kerri has endured during the pendency of

19

this case.  Beginning in 2008, Kerri devoted her heart and soul to her cardiac screening company, CardiacScan, that has been incredibly beneficial to the people of her community.  In the second section of the Compendium of Letters filed with the Court, we include 18 testimonial letters that Kerri received over the years (not for the purpose of this case) from clients who describe how meaningful this company has been.

As described by the national CEO of CardiacScan,

> In 2008, fully aware of the indictment and charges pending against Kerri, I believed in her innocence so deeply that I asked her to form a CardiacScan Imaging of her own in New York.  She has since built her New York based company into something to be very proud of.  Her integrity, loyalty and tireless work ethic have allowed her to fulfill cardiac screening contracts with many of the Tri-State Unions and Hospitals, screening over 12,000 people. Most admirably is her work with the High School students performing Adolescent Cardiac Screenings. *Her work . . . has saved countless number of lives.  Letter from Donna Bright* (emphasis added).

Kerri's company has helped many thousands of people, mostly public servants and children, to discover significant and potentially life-threatening health problems.  As the President of the Nassau County Police Benevolent Association attests, "[t]o credit [Kerri] and her business for saving more than a few lives would not be a stretch to say.  Kerri has always conducted herself as the utmost professional while counseling my members on issues related to their health and well being." *Letter from James Carver.*

Kerri's company has been instrumental in providing much-needed screening to high school students.  "This program has been lauded all over the state of New Jersey as a test that provides conclusive results as to whether a student has any heart

problems. In the seven years that this screening has been administered in the high schools to about 1,700 students, about 60 have been found to have some sort of abnormality, some very serious, therefore saving their lives. Without the diligence and hard work of Kerri Kaley, I seriously doubt that this program would be in existence today." *Letter from Fred C. Hirsch*. As Mr. Hirsch goes on to say, "[o]ur foundation would suffer greatly if Kerri Kaley was incarcerated even for a short period of time. The work she does for us and the students of Bergen County cannot be measured in dollars and cents, as no one can put a price on a human life. I implore you, no I beg you to be lenient in your sentencing and not incarcerate Kerri Kaley." *Id. See also Letter from James Fisher* ("Our pride and joy, Sean, passed on his 13th birthday . . . Since then we have been providing heart screenings in three different towns . . . Kerri is a very important cog in the wheel, providing, and discovering over 220 freshmen with undiagnosed heart conditions. . . this has changed and definitely saved their lives.").

Kerri's hard work in building up CardiacScan Imaging has resulted not only in huge benefits to her clients and to the students she has helped, but also to the people she employs. As one of her employees has attested, "I have personally seen the pride and commitment that Kerri takes in her clientele and their health. During my time as her employee I have seen Kerri act in nothing but the most ethical and professional manner in dealing with both our patients and the clientele that contracted us which includes police departments, fire departments, unions and school districts. . . . I have found that Kerri takes personal interest in all her employees and goes out of her way

regularly to make sure that her staff is not only happy as employees but that are also doing well in life." *Letter from Wendy Cao.*

### B. The nature and circumstances of the crime support a significant downward variance.

Kerri Kaley recognizes and accepts that she was convicted of serious charges for which a substantial punishment will be imposed. Without seeking to diminish the jury's findings, however, § 3553(a)(2) requires the Court to consider the nature and circumstances of the crime and whether the guideline range is consistent with the criminal acts. Relative to most other cases involving conspiracy, theft, money laundering, and obstruction, the acts at issue in this case were of a different nature, and accordingly support a lesser sentence than that reflected by the guideline range.

First, there is no clear victim. The Government itself does not seem to know who the victim was, as its theory on this matter changed from one trial to another. The Government based its case against Jennifer Gruenstrass on the argument that Ethicon, Kerri's employer, was the victim. After this theory failed to persuade the Gruenstrass jury, the Government switched during Kerri's trial to the argument that it was the hospitals who were the victims. But even though the medical devices were removed openly in the middle of the day, during the 10+ years of the conspiracy, not one of over 50 hospitals ever complained, called the police, reported a single theft, or identified a medical device that was missing without its permission. Even after the Government filed its case, only one hospital inquired as to restitution for "possible" disappearance of prescription medical devices. At trial, only two hospital

22

administrators were called to testify against Kerri (while numerous other hospital witnesses testified that nothing was stolen). The materials manager from one of Kerri's hospitals describes Kerri as "someone who has been convicted of crimes without any victims." *Letter from Deborah Carter.*

Second, while it may not make Kerri's actions right, the practice of removing items from hospital storage areas and reselling them was widespread throughout the industry at the time. **It is important to note that the Government *agrees* this was a grey area, and that Kerri's actions were "industry practice."** This was not a black and white crime where it was obvious that Kerri and her co-defendants were doing wrong. Kerri and her co-defendants did not break into hospitals and cart out items in the dark of night. Their actions were open and notorious and were widely considered, at the time, to be acceptable.

Although the Government now seeks to play up the seriousness of Kerri's offenses, it was far more candid during the sentencing of Frank Tarsia, one of Kerri's co-conspirators. During Mr. Tarsia's sentencing hearing, his counsel argued to the court that the medical supplies at issue in this case came from hospitals who didn't want them any more, and that although Ethicon technically had a requirement that the products should be returned, Ethicon did not actually want the items back. He further described the "grey market" in these unwanted items which Tarsia and Kerri sold. *United States v. Frank Tarsia*, Case No. 05-80192-Cr-Ryskamp (S.D. Fla.) (September 20, 2006) (D.E.105 at 2-11).

In response, the prosecutor (the same one who tried Kerri's case) not only did not

23

dispute this description of the circumstances, but he added that it had become the "industry practice." D.E. 105 at 2:14. The prosecutor told Judge Ryskamp that *all 20 of the defendants in other cases who had entered pleas and cooperated described the gray market in the same way.* (D.E. 105 at 2:13-16). In other words, all of them believed both that the products were not wanted by the hospital and that the suppliers did not want the products back. And the prosecutor conceded that it was not in Ethicon's "interest" to encourage such returns and "that Ethicon doesn't like to do it, of course." (DE105-2:17.)

Third, those who worked with Kerri at the time, knowing of this case, still attest to her integrity and honesty in how she conducted herself on behalf of Ethicon. The materials manager of one of the hospitals where Kerri was the Ethicon rep describes Kerri as follows:

> I have dealt with hundreds of sales reps over the years. It is a field divided by the good, the bad, and the truly ugly. There are those few sales reps who you truly depend on, . . . and then there's Kerri Kaley. *Kerri Kaley is the gold standard I hold all sales reps to even to this day."Letter from Deborah Carter* (emphasis added).

This glowing testimonial of Kerri's work as a sales rep, from one of her supposed victims, is not an anomaly. The Director for Perioperative Services at South Nassau Communities Hospital, who has been "part of the leadership of operating rooms since 1998 and ha[s] been closely involved in the purchasing and utilization of the supplies needed for surgery," defends Kerri as follows:

> I have known Kerri in a professional association when she was my sales representative for Ethicon Corporation from 2000 until approximately 2005. . . . Kerri built relationships with her customers and provided

24

excellent service all the time. . . . Kerri always [was] professional and took her position seriously. . . . She always treated the surgeons and staff with respect and consideration.   In all these years and different affiliations, I have never felt uneasy or uncomfortable with any dealing I have had with her. . . . *She is not a reckless person; she is not a person who disregards rules or laws. Kerri is a person of integrity and was always sincere and honest in her representation of her product or service.* She is one of the nicest people I know and a truly good human being. *Letter from Patrice Kelly* (emphasis added).

Still another Director of Perioperative Services who was personally responsible for the product Kerri supplied at one of Kerri's assigned hospitals says this:

> She was always an attentive and responsive rep, available when needed. . . . I knew she was hard working and a straight shooter. I also knew that <u>no product</u> was removed from my Operating Room without it being part of a trade out of product or if I needed to make room on my shelves that were stocked with obsolete product (it happens!). It's a small O.R. and we would have noticed missing product. . . . . I have only known her to be a good person. . . . . She is respected in her community. I am proud to call her a friend. *Letter from Joan Ferrara.*

*See also Letter from Jenny Gruenstrass* ("Everyone respected Kerri, she had an amazing reputation with not just doctors and nurses but high valued administrators . . . She was . . . a true leader in the industry who built relationships with people whom, to this day, still show their support and backing of her character."); *Letter from Aimee Goodwin* ("Kerri was highly respected among all the surgical staff including many of the surgeons I worked with. . . . I am writing this to inform you that Kerri has character and integrity that surpasses most people I have worked with.  She is an asset to anyone that has worked with her."); *Letter from Gerry Walsh* ("Kerri and I both worked for Ethicon . . . Kerri was a tough person to compete against because her customers loved her and in many ways became family with her.  This is not normal for

most sales representatives but for Kerri it was natural because Kerri gave to others.").

Kerri is spoken of just as highly from others who operated in the medical sales

industry.  One person who has worked for a competitive medical product company since

the time Kerri was at Ethicon explains the following:

> Kerri's reputation among our customers is exemplary and unparalleled.
> Our customers absolutely adore Kerri . . . Not once, during the 11 years
> that this court proceeding has progressed, have I heard a single negative
> word about Kerri, or any inkling whatsoever of any stolen product or
> conspiracy from any customer or hospital official.  Rather, our mutual
> customers, who I continue to work with every day, are shocked, saddened
> and appalled at the relentless pursuit during this time and sadly the
> recent verdict rendered.  *Letter from John Stubenrauch.*

Another person who knew Kerri professionally during the relevant time period,

and who testified for the Government at Kerri's first trial but was unable to testify at

the second because of health issues, describes the circumstances as follows:

> The one title I would never attach to Kerri is criminal. . . . Besides being
> her friend I am also her insurance agent. . . .  I also testified that I helped
> Kerri move boxes of medical devices from her basement to the curb of her
> house for garbage pickup.  That's the same equipment she was accused
> of 'stealing' and reselling.   You have to wonder why someone who
> allegedly stole medical devices would then put them out for garbage
> pickup.  I can categorically state that Thomas Watts-Fitzgerald has got
> this all wrong when it comes to labeling Kerri as a criminal. . . . Kerri
> was always very forthcoming about what she was doing with these
> outdated medical devices . . . Kerri was not [secretive] and believed she
> was not committing a crime. . . . I cannot speak to the events that caused
> witnesses to change their testimony from the first trial, but I believe
> Thomas Watts-Fitzgerald was, at the very least, overzealous in gaining
> a conviction against Kerri Kaley.  I will repeat – Kerri is not a criminal.
> *Letter from Steven C. McCarty.*

This emphatic and enthusiastic support from numerous people who are in a

position to know about the nature and circumstances of the crime should be given

substantial weight in determining an appropriate sentence. It is rare indeed that the "victims" of a crime maintain such an incredibly high opinion of the defendant's integrity and honesty, and so substantially disavow the existence of a crime. This support speaks to the unusual nature and circumstances of this case and suggests that a sentence significantly below the guidelines range is appropriate.

Fourth, the P.S.I.'s loss calculation grossly overstates the true harm. The Government's own star witness, Keith Danks, at one point testified that only about 5% of the material in this grey market was stolen. U.S.S.G. §2B1.1, note 20©, recognizes that a downward departure is appropriate in which "the offense level determined under this guideline substantially overstates the seriousness of the offense." Using the 5% figure offered by the Government's witness, Kerri's low end range would be approximately 41 months – drastically less than the 121 months low end number that the P.S.I. calculates. The 16-level increase that the PSI applies is *more than* the enhancement Kerri would have received if she had boarded an airplane with a bomb (2K1.5(b)(1) - 15 levels) or if she had committed a felony to promote terrorism (3A1.3(a) - 12 levels). The loss table, as applied to this case, results in a guideline level that is grossly disproportionate to the actions for which Kerri has been convicted. *See, e.g., United States v. Emmenegger*, 329 F. Supp. 2d 416, 427 (S.D.N.Y. 2004).

### 3. A 24 month sentence would amply reflect the seriousness of the crime, respect for the law, just punishment, adequate deterrence, and protection of the public. § 3553(a)(2).

A sentence of 24 months is also appropriate under 18 U.S.C. § 3553(a)(2). This subsection directs the Court to consider the need for the sentence to reflect the

seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; and to protect the public from further crimes of the defendant.

**A.    The need for the sentence to reflect the seriousness of the offense, respect for the law, and just punishment, and to afford adequate deterrence to criminal conduct.**

Kerri has been convicted of serious offenses.  But the sentence sought by the Government is far harsher than appropriate and is not necessary to reflect the seriousness of the offense or to afford adequate deterrence.

As set forth in depth above when discussing the nature and circumstances of the crime, Kerri's guideline range grossly overstates the seriousness of what Kerri did given that her actions were "industry practice" at the time.  Moreover, especially in light of the fact that none of the hospitals complained at the time, Kerri's guideline calculation (which is driven in large part by the loss amount) substantially overstates the significance of the crime.

Moreover, Kerri's punishment includes not only that which the Court will impose at her sentencing, but also the substantial hardship imposed by the pendency of this case during the past 10 years.  While Kerri's legal strategy and decisions contributed to the length of the proceedings, all of her actions were driven by the desire to exercise her rights to prove her innocence and prevent the hardship on her family that is now about to be realized:

> I know personally from my conversations with Kerri that she is utterly despondent in the knowledge of the impact that this verdict will have on her children, her marriage, and family/friends.  She continues to work

diligently at preparing her children for the sentencing outcome in December.  I pray that Your Honor takes into consideration the years Kerri and her family have spent with this grievous encumbrance that they have had to endure for over 10 years.

*Letter from Patricia D. Cherasard.  See also Letter from Jack Kelsey* ("Meeting the needs of her family for the past 11 years has been of the utmost importance to Kerri, but it has required incredible personal sacrifice and dealing with stresses beyond what I've ever seen anyone endure.").

As Kerri's son explains, "[w]hat I do want to stress by writing this message is the weight that me and my family have felt for eleven years.  The pain is and has been arduous."  *Letter from Brandon Kaley*.  Kerri has owned up to her legal issues throughout this period and "[w]hile running her business she was forthcoming to her clients about all that was going on with her legally."  *Letter from Stephani Dwyer*. Whether the sentence is one day or ten years, "Kerri will wear this like a scarlet letter," rendering an exorbitant sentence unnecessary. *Letter from The Ottimo Family*.

Courts have recognized the propriety of considering the hardships faced by criminal defendants when determining the appropriate sentence.  *See, e.g., Prosperi*, 686 F.3d 32; *United States v. Anderson*, 267 Fed. Appx. 847, 850 (11th Cir. 2008); *United States v. Gaind*, 829 F. Supp. 669, 671 (S.D.N.Y. 1993).  For example, in *Prosperi*, the defendants proceeded to trial and were convicted by a jury of conspiracy to defraud the United States.  Although their guidelines range was 87– to 108–months incarceration, the district court sentenced the defendants to six months of home monitoring, three years of probation, and 1,000 hours of community service.  *Prosperi*,

686 F.3d at 42.  The First Circuit affirmed the variance, explaining that the district court properly weighed the § 3553(a) factors and considered the roles of punishment and deterrence. *Id.*

The *Prosperi* court utilized as its rationale similar factors to those at issue here. For one, the court recognized the punishment inherent to a first-time offender who is thrust into the criminal justice system:

> I think it is very difficult at times, for those of us who are judges or prosecutors or lawyers, to put ourselves in the shoes of a person with no prior experience with the criminal justice system who finds himself or herself accused of a crime. I do not think, sometimes, we fully recognize the anguish and the penalty and the burden that persons face when called to account, as these men are, for the wrong that they committed.

*Id.* at 48.  The court also pointed to the district court's reasoning in acknowledging numerous letters received from the defendants' family, friends, and community members, and noted that it found them "sincere, supportive, and, I'm sure, an accurate portrayal of the defendants' lives." *Id.* at 41.  There were numerous letters detailing charitable work and support for friends and neighbors. *Id.* at 49.  This case has obvious applicability to Kerri's situation.

Given the unusual nature of this crime, the contributions of Kerri to her community over the last ten years, and the other circumstances of this case, the lengthy sentence requested by the Government "may work to promote not respect, but derision, of the law if the law is viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing." *Gall*, 552 U.S. at 54.  A sentence of not more than 24 months would be

considered by those in the community to be very substantial. (Indeed, *any* incarceration will be considered "a foul on the judicial process" by the members of her community). *Letter from The Murphy Family.* Such a sentence would be well more than sufficient to demonstrate the seriousness of the crime and to serve as an adequate deterrent. As one supporter puts it, "[t]he prison system has nothing to teach this individual, and the message has already been sent." *Letter from James McCormack.*

## B.    Protection of the Public

Kerri has demonstrated that she poses no risk whatsoever of recidivism through the exemplary way she has lived her life in the 10 years that this case has been pending. *See* § 3553(a)(2)©. Kerri's actions in this case constitute an aberration from the way she has led her life as an ethical, law-abiding member of society. This factor supports the propriety of a significant downward variance. *See United States v. Clay*, 583 F.3d 739 (11th Cir. 2007) (granting a significant downward variance based on the fact that the defendant was not likely to re-offend); *United States v. Chase,* 560 F.3d 828, 831 (8th Cir. 2009) (finding that lack of criminal history can be considered as the basis for a downward variance even though it is taken into account in calculating the guideline range); *United States v. Howe*, 543 F.3d 128, 133 (3d Cir. 2008) (same).

During the 10 year period Kerri has been on bond, she has behaved perfectly with not one incident or violation (just as before the time period of the Indictment). This clearly demonstrates she is no risk to reoffend. As one lawyer friend explains,

> Kerri has never been accused, let alone convicted, of a crime prior to or
> since, this occurrence. She has lived with these charges looming over her
> day in and day out for over 10 years, yet remained unwavering in her

31

commitment to her family, community and volunteer work. . . [G]iven the manner in which Kerri has lived her life both before and during the pendency of the charges, it is obvious there is no chance that she presents any real danger of becoming a reoffender. *Letter from William T. Burdo, Esq.*

The Sentencing Commission commissioned a report, *The Criminal History Computation of the Federal Sentencing Guidelines, Recidivism and the "First Offender,"*[4] which sets forth a statistical analysis of the type of person most likely and least likely to re-offend.  According to this analysis, the risk of Kerri re-offending is basically zero.  The study showed that 1) women are less likely to recidivate than men; 2) married people are less likely to recidivate than those who have never been married; 3) college graduates are less likely to recidivate than non-college graduates; 4) those sentenced under the fraud guidelines are less likely to recidivate than those sentenced under any other guideline; 5) non-violent offenders are less likely to recidivate than violent offenders; 6) first time offenders are less likely to recidivate than repeat offenders; 7) those who were employed are less likely to recidivate than those who weren't; 8) non-drug users are less likely to recidivate than drug users; and 9) older individuals and less likely to re-offend than those in their 20's and 30's.  Every one of these factors indicates that Kerri is not a risk to recidivate.

The Eleventh Circuit discussed the likelihood of recidivating in *United States v. Clay*, 483 F.3d 739 (11th Cir. 2007).  There, the district court sentenced the

---

[4] *See The Criminal History Computation of the Federal Sentencing Guidelines, Recidivism and the "First Offender,"* and *U.S. Parole Commission Salient Factor Score,* all found at  www.ussc.gov/research.html.

defendant to 60 months even though his guidelines were 188-235, as a result of the district court's view that the defendant was not likely to re-offend.  In affirming, the Eleventh Circuit stressed that a sentencing court is "require[d] . . . to consider characteristics of the defendant and the offense that make it more or less likely that the defendant will reoffend."  *Id.* at 745.  Because the defendant in that case had "fundamentally changed since his offense" and "poses a lesser risk to the community," the Eleventh Circuit determined that the sentencing court was correct in issuing a variance.  *Id.* at 746.  *See also Gall,* 552 U.S. at 57-59; *United States v. Cherry,* 487 F.3d 366, 369-70 (6th Cir. 2007) (granting significant downward variance from the guideline range where the defendant presented a low risk to reoffend); *Prosperi*, 686 F.3d at 48 (affirming non-incarcerative sentence where there was no risk of recidivism).

Summarizes one friend, "[s]he has fought this legal battle to preserve her name for 11 years, spent her life savings, her children's college funds, her retirement funds and her home equity to fight these charges, and she has lost.  She has already paid a terrible price.  She is no danger to anyone anywhere. . . ." *Letter from Karen Wallace Walter*.  An incarcerative sentence is not necessary to protect the public.

**4.  A below-Guidelines sentence would permit Kerri to begin paying restitution more quickly.  § 3553(a)(4).**

Kerri is likely to face a fairly substantial restitution order.  A guidelines sentence will keep her behind bars for a good portion of the remainder of her working life, and will ensure that the business she has built up is completely destroyed.  By

contrast, allowing Kerri to return to the workforce at the earliest possible opportunity will permit her to begin paying her restitution.  This is a factor that supports a sentence of not more than 24 months.  18 U.S.C. § 3553(a)(4).

In addition, it is important to note that immediately after her conviction, Kerri agreed to forfeit $500,000 instead of requiring the Government to present its case to a jury.  This action supports the propriety of a downward variance.  *See United States v. Kim*, 364 F.3d 1235 (11th Cir. 2004); *United States v. Gardellini*, 545 F.3d 1089 (D.C. Cir. 2008).

## CONCLUSION

Kerri Kaley is "an individual of extraordinarily high moral caliber" who has already paid considerably for her actions.  *Letter from William T. Burdo*.  "It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate . . . the crime and the punishment to ensue."  *Koon v. United States*, 518 U.S. 81, 113 (1996).  This is a case that merits a below-Guidelines sentence, in reflection of the  disparity between the sentence of others, the nature and circumstances of the crime, Kerri's unlikeliness to recidivate, and Kerri's very strong personal traits and history of community contributions:

> To be a person that someone can go to for trust, for honesty, and for friendship, is a person everyone needs in his or her life - and Kerri is one of those people for me and not only me. . . . She doesn't take community, friends, and family for granted.  She takes those people with as much love, care, and attention as any one person wishes to receive from a friend.  To take her away from not only her home, but from her family, her sons, her friends, her community would be a loss for not only her but for the plethora of people that depend on her as a mom, as an aunt, as a sister or as a best friend.  *Letter from Deane Ciampa*.

For the reasons set forth in this memorandum, we respectfully request that this Court sentence Kerri to a term of imprisonment not longer than 24 months.

Respectfully submitted,

**MARKUS/MOSS** PLLC
40 N.W. Third Street
Penthouse One
Miami, Florida  33128
Tel: (305) 379-6667
Fax: (305) 379-6668
markuslaw.com

By:      /s/ David Oscar Markus
         David Oscar Markus
         Florida Bar Number 119318
         dmarkus@markuslaw.com

         A. MARGOT MOSS
         Florida Bar Number 091870
         mmoss@markuslaw.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was e-filed this 23rd day of November 2016, and served on all appropriate parties through that system.

/s/ David Oscar Markus
David Oscar Markus